UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
RENATO SPAMPINATO,

                    Plaintiff,

                                        MEMORANDUM & ORDER
          -against-                     20-CV-0959 (JS)

ANDREW SAUL, COMMISSIONER OF SOCIAL
SECURITY,

                    Defendant.
---------------------------------------X
APPEARANCES
For Plaintiff:      Richard Blake Seelig, Esq.
                    Seeling Law Offices, LLC
                    299 Broadway, Suite 1600
                    New York, New York  10007

For Defendant:      Dennis J. Canning, Esq.
                    United States Attorney's Office
                    Eastern District of New York
                    c/o SSA/OGC
                    601 East 12th Street, Room 965
                    Kansas City, Missouri  64106

SEYBERT, District Judge:

          Plaintiff Renato Spampinato ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), challenging the Commissioner of Social Security's (the "Commissioner") denial of his application for Social Security Disability Insurance Benefits.  (Compl., ECF No. 1, ¶¶ 1-2.)  Presently pending before the Court are the parties' cross-motions for judgment on the pleadings.  (Pl. Mot., ECF No. 9; Pl. Support Memo, ECF No. 10; Pl. Reply, ECF No. 13; Comm'r Mot., ECF No. 11; Comm'r Support Memo, ECF No. 11-1.)  For the

following reasons, Plaintiff's motion is DENIED, and the Commissioner's motion is GRANTED.

BACKGROUND[1]

I.  Procedural History

On April 13, 2016, Plaintiff completed an application for disability insurance benefits alleging disability as of October 13, 2013, due to left knee pain, right knee pain, right shoulder pain, sleep apnea, and high blood pressure. (R. 13, 145, 176.) After Plaintiff's claim was denied, he requested a hearing before an Administrative Law Judge ("ALJ") (R. 53-66, 68-73, 74-75.) On October 23, 2018, Plaintiff, accompanied by a representative, appeared for a hearing before ALJ Andrew S. Weiss. (R. 27-52.) Dr. Steven Golub, a medical expert, testified at the hearing. (R. 38-48.) Dale Pasculli, a vocational expert, also testified at the hearing. (R. 49-51.)

In a decision dated November 2, 2018, the ALJ found that Plaintiff was not disabled. (R. 13-26.) On December 23, 2019, the Social Security Administration's Appeals Council denied Plaintiff's request for review, and the ALJ's decision became the final decision of the Commissioner. (R. 1-6.)

---

[1] The background is derived from the administrative record filed by the Commissioner on May 29, 2020. (R., ECF No. 8.) "R." denotes the administrative record. For purposes of this Memorandum and Order, familiarity with the administrative record is presumed. The Court's discussion of the evidence is limited to the challenges and responses raised in the parties' briefs.

Plaintiff initiated this action on February 21, 2020 and moved for judgment on the pleadings on July 25, 2020. On September 18, 2020, the Commissioner filed a cross-motion for judgment on the pleadings.

II.  Evidence Presented to the ALJ

The Court first summarizes Plaintiff's employment history and testimonial evidence before turning to the medical records and consultative evidence.

A.  Testimonial Evidence and Employment History

Plaintiff was born in 1963. (R. 145.) He completed high school and served as a firefighter for the New York City Fire Department ("FDNY") from 1992 to 2013. (R. 31.) At that time, he left the FDNY because "numerous injuries to his knees and shoulders" precluded him from discharging his firefighting duties. (R. 32, 387.)

At the time of the October 23, 2018 hearing, Plaintiff was fifty-five years old. (R. 145.) He testified that he retired from FDNY due to a disability. (R. 32.) On two occasions in December 2016 and January 2017, however, he worked as a back-up snowplow operator. (R. 30-31.) Plaintiff complained of debilitating pain from both his knees and his shoulder. (R. 33.) He explained that he underwent left knee surgery in 1986, prior to joining the FDNY; two right knee surgeries while working in the

FDNY; and right shoulder surgery after leaving the FDNY.
(R. 33-34.)

Upon questioning from his attorney, Plaintiff explained
that he suffers from osteoarthritis. (R. 34.) He testified that
he can walk only short distances and stand for fifteen minutes
before his muscles "tighten[] up" and his joints "get sore."
(R. 34-35.) Plaintiff further testified that to alleviate the
pain he alternates between sitting and standing, and he stretches
and uses ice to get comfortable. (R. 35-36.) According to
Plaintiff, he can sit for two hours and stand for two hours before
his knees become aggravated by swelling and joint pain. (R. 36.)
Describing his daily activities, Plaintiff stated that he gets his
teenage kids out in the mornings, drives them to school a few miles
away, does a "little light shopping," and helps his wife with
laundry and dinner. (R. 36-38.) Although Plaintiff drives his
kids to school, he cannot go on long drives, because he needs to
take breaks to "stretch around a little while." (R. 37-38.)

B.   <u>Medical Evidence</u>

Prior to the alleged disability onset date, the medical
record shows that Plaintiff received three knee surgeries. First,
in 1986, Plaintiff underwent arthroscopic surgery on his left knee.
(R. 258.) Second, in 1995, Plaintiff had reconstructive surgery
on the anterior cruciate ligament ("ACL") in his right knee after
sustaining an injury while working as a firefighter. (R. 338.)

4

Third, in 2008, he underwent arthroscopic surgery on his right knee. (R. 258, 338.) Plaintiff also injured his right shoulder in 2007 and attended physical therapy. (R. 338.) He returned to work as a firefighter after each of his injuries. (R. 338.)

Plaintiff suffered another injury while on duty as a firefighter on October 7, 2013. (R. 342.) Upon examination, Plaintiff's knees showed tenderness and swelling with limited range of motion. (R. 342.) He underwent an MRI, which revealed prior ACL reconstruction and some meniscus tears. (R. 333-34.) Plaintiff received Naprosyn and was referred to an orthopedist to start physical therapy. (R. 341-42.)

      1.   <u>FDNY Medical Board</u>

The FDNY's Chief Medical Officer, Dr. K. Kelly, reviewed Plaintiff's disability retirement application in a memorandum dated November 27, 2013. (R. 398-99.) Dr. K. Kelly confirmed Plaintiff's prior diagnoses regarding his knees and right shoulder and recommended limited service, concluding Plaintiff has a partial permanent disability that renders him unfit for FDNY work beyond light duty. (R. 398-99.)

On April 23, 2014, the FDNY Medical Board conducted an interview and examination of Plaintiff. (R. 385-87) After reviewing Plaintiff's history of injuries and interview and examination findings, the Medical Board found Plaintiff is permanently disabled because of his right knee, particularly his

degenerative joint disease, but not due to his right shoulder, as
there was no evidence of a work-related shoulder injury. (R. 387.)
The Medical Board reaffirmed this finding in a September 24, 2014
memorandum, which characterized Plaintiff's disability as "due to
the progression of his long standing osteoarthritis." (R. 389.)
By subsequent memoranda, the Medical Board affirmed its prior
decisions awarding ordinary disability benefits, rather than
accidental disability benefits. (R. 391, 393, 395, 397.) As a
result, the Medical Board stated that Plaintiff may engage in a
suitable gainful employment. (E.g., R. 397.)

### 2.   Initial Orthopedic Treatment

Shortly thereafter, Plaintiff resumed his course of
treatment for shoulder and knee pain before Dr. Anne Kelly, a
board-certified orthopedic surgeon who had performed his 2008
arthroscopic surgery. (See generally R. 242-61.) On physical
examination, Dr. A. Kelly found medial and lateral joint line
tenderness and 1+ effusion. (R. 256.) Plaintiff's range of motion
was slightly limited, and his Lachman test was mild. (R. 256-57.)
Finding that Plaintiff's right knee was "stable" but "painful,"
Dr. A. Kelly recommended he continue Naprosyn, recommence physical
therapy, and begin to "use ice more aggressively." (R. 257.)

At a December 2, 2013 follow-up visit, Dr. A. Kelly noted
Plaintiff's knee was swollen and tender, but that "he has not been
icing or been to PT or been taking medicine as he finished the

Naprosyn." (R. 255.) She encouraged Plaintiff to ice every night. (R. 255.) Plaintiff returned to Dr. A. Kelly on March 10, 2014, this time to receive treatment for "his new injury to his right shoulder," which he claimed had been increasingly bothering him over the previous eight months and causing issues sleeping. (R. 253.) Prior to the March 10 visit, Plaintiff had undergone an MRI of his right shoulder. (R. 439-40 (MRI dated February 24, 2014).) The physical examination showed shoulder and biceps tenderness and pain, and MRI results were consistent with rotator cuff tearing. (R. 253-54.) Dr. A. Kelly recommended Plaintiff restart Mobic and reiterated that he should begin physical therapy and use ice aggressively. (R. 254.) At a follow-up visit dated May 2, 2014, Dr. A. Kelly observed Plaintiff "remains plagued by pain, pain at night, pain sleeping," concluding "[h]e needs a rotator cuff repair." (R. 252.)

Plaintiff next visited Dr. A. Kelly on September 5, 2014, after injuring his left bicep when lifting his motorcycle. (R. 251.) Physical examination indicated bicep muscle tear and a "little" weakness in supination, but otherwise Dr. A. Kelly found Plaintiff had "excellent full range of motion of the shoulder and elbow." (R. 251.) Plaintiff also reported "intermittent right knee symptoms, which he treats with ice and Advil." (R. 251.) Dr. A. Kelly advised Plaintiff to return for evaluation of the

right knee and right shoulder if the pain he reported persisted. (R. 251.)

Plaintiff returned to Dr. A. Kelly on November 12, 2014, to review X-rays of his right knee. (R. 250.) According to Dr. A. Kelly's treatment notes, the X-rays showed the ACL hardware, significant lateral joint narrowing, and moderate to severe lateral degenerative joint disease. (R. 250.) Reviewing a subsequent MRI, Dr. A. Kelly observed cartilage loss and medial meniscal tearing. (R. 249.) Plaintiff also reported episodes where his knee would give way, prompting Dr. A. Kelly to perform an aspiration and injection. (R. 249.) She further noted that Plaintiff "may be a candidate for an arthroscopy," but "it would have diminished results based on the extent of arthritis in his knee." (R. 249.)

On December 4, 2014, Plaintiff underwent right shoulder arthroscopy with rotator cuff repair with Dr. A. Kelly. (R. 260-61.) The post-operative diagnosis was rotator cuff tear, impingement, and labral tear. (R. 260.) At a December 12, 2014 follow-up visit, Dr. A. Kelly opted against starting Plaintiff on physical therapy, observing he was "doing very well." (R. 247.) Plaintiff "continue[d] to regain motion on his own without PT." (R. 246.) Dr. A. Kelly also assessed Plaintiff's right knee as improved, noting he "continues to get relief from the injection" and recommending he use an exercise bike or elliptical machine.

(R. 246.)  Plaintiff remained positive about the outcome of his right shoulder surgery throughout spring 2015, consistently reporting that he was "doing very well" and was "happy with the results." (R. 244-45.)  In light of this, including Plaintiff's reports that he was not experiencing pain, Dr. A. Kelly found physical therapy unnecessary. (R. 244-45.)

       3.   <u>Treatment for Sleep Apnea</u>

       On May 23, 2014, Plaintiff presented to Dr. Jerry Ipe, D.O., for treatment of obstructive sleep apnea. (R. 263.) Plaintiff advised that he was "still not tolerating" previously prescribed continuous positive airway pressure ("CPAP") machines. (R. 263.)  To help him sleep, Plaintiff reported drinking wine and taking Ambien. (R. 263.)  Dr. Ipe ordered a sleep study, found that Plaintiff suffered from severe obstructive sleep apnea, insomnia, and questionable alcohol withdrawal, and directed Plaintiff to limit alcohol consumption at night. (R. 262.)  The sleep study showed severe sleep disordered breathing (R. 282), which Dr. Ipe characterized as obstructive sleep apnea in a July 31, 2014 follow-up visit (R. 265). As a result, Dr. Ipe prescribed a CPAP machine and nasal pillows. (R. 266-67.)  When Plaintiff returned to Dr. Ipe on December 2, 2014, Dr. Ipe continued to note insomnia and severe obstructive sleep apnea. (R. 268.)  At subsequent visits in August and November 2015, Dr. Ipe noted that Plaintiff was tolerating the CPAP better, although Plaintiff

consistently reported fatigue.    (R. 271, 274.)    Dr. Ipe also
considered whether Plaintiff's fatigue was caused by "other
etiology," such as low testosterone and vitamin D levels, and if
alcohol withdrawal caused him to wake at night.  (R. 273, 276.)

### 4.   Subsequent Orthopedic Treatment

Almost a year after seeking treatment with Dr. A. Kelly,
on March 28, 2016, Plaintiff began to see Dr. Charles Milchteim
for bilateral knee and right shoulder pain that started in fall
2015.    (R. 306.)    Plaintiff reported that Advil and Tylenol
provided "good relief"; however, his symptoms worsened with
sitting, standing, twisting, walking, bending, squatting,
kneeling, lifting, exercise, stairs, and lying in bed, but improved
with ice, heat, and massage.  (R. 306.)  On physical examination,
Dr. Milchteim found right shoulder tenderness, decreased range of
motion, positive impingement test, and bilateral knee tenderness,
albeit with stability and full strength.  (R. 307-08.)  He further
found that Plaintiff's gait was non-antalgic, and that he suffered
from joint pain, sleep disorders, and was obese.  (R. 307-08.)
Based on the foregoing, Dr. Milchteim diagnosed Plaintiff with
moderate osteoarthritis of the right shoulder, advanced
osteoarthritis of the right knee, and mild to moderate
osteoarthritis of the left knee.  (R. 308.)  He recommended
physical therapy for the right shoulder and bilateral knee
injections.  (R. 308.)

Shortly thereafter, Plaintiff began to receive Orthovisc injections to both knees.   (R. 300, 303, 311.)   Plaintiff invariably reported the injections were ineffective (R. 311), "helped about 60 percent" (R. 300, 303), and "helped about 40 percent" (R. 296).   Throughout this time, Dr. Milchteim's examination findings were consistent.

Plaintiff also saw Dr. Shyam Vekaria, a colleague of Dr. Milchteim's, in September and December 2016.   Dr. Vekaria found Plaintiff suffered from joint pain; sleep disorders; right knee effusion, tenderness, crepitus, and decreased range of motion; mildly antalgic gait; and left knee tenderness and decreased range of motion.   (R. 374-75, 377-78.)   Physical examination revealed Plaintiff had full leg strength, normal straight leg raises, and no knee instability.   (R. 375.)   Dr. Vekaria diagnosed Plaintiff with post-traumatic osteoarthritis of the right knee and primary osteoarthritis of the left knee.   (R. 375.)   He also believed Plaintiff was a candidate for a total knee replacement of the right knee; Plaintiff advised he would think about it.   (R. 375, 378.)   Plaintiff further reported that physical therapy provided relief to his symptoms.   (R. 378.)

On March 20, 2017, Plaintiff returned to Dr. A. Kelly after a nearly two-year absence.   Physical examination revealed Plaintiff's knees had decreased range of motion and were tender. (R. 382.)   Plaintiff attended physical therapy at the Department

of Veterans Affairs in June and July 2017, reporting improvement of his intermittent right knee pain.  (R. 411.)

     5.  <u>Orthopedic Treatment with Dr. Steinvurzel</u>

     On March 26, 2018, Plaintiff established care with Dr. Joshua Steinvurzel, a board-certified orthopedic surgeon, for an "evaluation of pain and swelling in his right knee that occurred several years ago."  (R. 423.)  Plaintiff reported "moderate to severe pain and swelling," with discomfort "localized to the medial aspect of the knee."  (R. 423.)  He described the pain as having a near-constant "aching quality" that had been progressively worsening over time, especially when walking, squatting, and pivoting.  (R. 423.)  Plaintiff added that the pain was partially relieved by rest.  (R. 423.)  Dr. Steinvurzel reviewed a prior X-ray which showed moderate to advanced tricompartmental osteoarthritis.  (R. 423; <u>see also</u> R. 406, 408.)  Based on his examination, which showed Plaintiff was overweight and suffered from tenderness, decreased range of motion, and decreased quadriceps strength (4+/5), Dr. Steinvurzel assessed severe primary localized osteoarthritis of the right knee.  (R. 424-25.) After discussing treatment options, Plaintiff expressed his desire to proceed with physical therapy.  (R. 425.)  Those findings were largely unchanged at a subsequent May 17, 2018 visit, except that

Plaintiff's right knee was moderately swollen.  (R. 431-32.)[2]  Dr. Steinvurzel ordered a Monovisc injection.  (R. 432.)

At an October 12, 2018 visit, Dr. Steinvurzel completed a functional assessment of Plaintiff's ability to work in a form titled, "Patient's Functional Assessment to do Sedentary Work." (R. 420.)[3]  In the form, Dr. Steinvurzel opined that Plaintiff could stand and/or walk for less than two hours in an eight-hour workday; sit for less than two hours in a workday; lift and carry more than five pounds but less than ten pounds for one-third of an eight-hour workday; and lift and carry less than five pounds for up to two-thirds of an eight-hour workday.  (R. 420.)  He further opined that Plaintiff requires frequent fifteen-minute breaks during the workday and that he suffers from pain which prevents him from performing eight hours of work.  (R. 421.)

C.    Opinion Evidence

On June 29, 2016, Plaintiff presented to Dr. Kanista Basnayake, M.D., for a consultative examination.  (R. 324-30.) Plaintiff reported bilateral knee pain that gets "worse with

---

[2] Plaintiff also complained of pain to his right thumb, X-rays of which revealed moderate osteoarthritis.  (R. 431-32.)

[3] At this visit, Plaintiff also complained of pain to his left elbow, which Dr. Steinvurzel assessed as epicondylitis or tennis elbow.  (R. 435.)

activities" but "better with rest," and left shoulder pain[4] that "never gets better." (R. 324.)  Plaintiff also described his daily activities of living, stating he cooks twice weekly, cleans twice weekly, does laundry once per week, shops once per week, and performs daily childcare. (R. 325.)  In addition, he watches TV, listens to the radio, reads, and attends physical therapy, medical appointments, and his children's sports activities.  (R. 325.) Dr. Basnayake's examination revealed that Plaintiff weighed 230 pounds and his blood pressure was 106/82. (R. 325.)  He reviewed X-rays that showed degenerative joint disease of the right shoulder and a loose body in Plaintiff's left knee.  (R. 327, 328-29.) Plaintiff had a normal gait and stance; could rise from a chair without difficulty; and needed no help changing for the exam or getting on or off the exam table.  (R. 325.)  He had difficulty walking on his heels and toes and could squat halfway.  (R. 325.) Dr. Basnayake found Plaintiff had full range of motion in all joints, full strength throughout, and no atrophy.  (R. 325-26.) Based on his examination and review of Plaintiff's medical history, Dr. Basnayake diagnosed Plaintiff with high blood pressure, sleep apnea, bilateral knee pain, and right shoulder pain.  (R. 327.) Dr. Basnayake opined that Plaintiff should avoid driving and

---

[4] Based on the medical record, the Court believes Dr. Basnayake's treatment notes incorrectly refer to Plaintiff's left shoulder, rather than his right shoulder.

operating machinery due to his sleep apnea condition and that Plaintiff's right shoulder and bilateral knee pain caused "very mild limitations for prolonged standing, walking, climbing, bending, lifting, carrying, and kneeling." (R. 327.)

On March 21, 2017, Plaintiff presented to Dr. P. Leo Varriale, M.D., an orthopedist, for an independent medical examination. (R. 379-81.) Dr. Varriale observed decreased range of motion of the right knee, moderate swelling, tenderness, mild anterior instability (but no medial or lateral instability), quadriceps atrophy, and patella grinding. (R. 380.) Based on his physical examination and review of Plaintiff's medical history, Dr. Varriale diagnosed him with osteoarthritis of the right knee. He further opined that Plaintiff has "a moderate disability in that the claimant cannot lift more than 10 pounds and he cannot stand or walk for more than 30 minutes at a time." (R. 380.) Three weeks later, Dr. Varriale wrote an addendum to his earlier report to clarify that Plaintiff's arthritis was related to his 1995 injury.

Last, Dr. Steven A. Golub, M.D., testified at Plaintiff's hearing as an independent medical expert. (R. 39.) Dr. Golub stated that he had listened to the testimony and reviewed a subset of Plaintiff's medical records. (R. 39 (testifying to reviewing R. 242-332).) Dr. Golub opined that Plaintiff did not have a severe impairment. (R. 40.) He further observed that Dr.

Basnayake's medical report showed X-ray findings of degenerative joint disease of the right shoulder and a loose body in the left knee, and normal findings on the physical examination.  (R. 40.)

DISCUSSION

I.   Standard of Review

            In reviewing the ruling of an ALJ, the Court does not determine de novo whether the plaintiff is entitled to disability benefits.  Thus, even if the Court may have reached a different decision, it must not substitute its own judgment for that of the ALJ.  See Jones v. Sullivan, 949 F.2d 57, 59 (2d Cir. 1991).  If the Court finds that substantial evidence exists to support the Commissioner's decision, the decision will be upheld, even if evidence to the contrary exists.  See Johnson v. Barnhart, 269 F. Supp. 2d 82, 84 (E.D.N.Y. 2003).

II.   The ALJ's Decision

      A.   The Five-Step Disability Analysis

            Initially, the ALJ found that Plaintiff meets the insured-status requirements of his claim through December 31, 2019. (R. 15.)  Next, the ALJ applied the familiar five-step disability analysis and concluded that Plaintiff was not disabled from October 13, 2013, the alleged disability-onset date, through November 2, 2018, the date of the decision.  (R. 15-22); see 20 C.F.R. § 404.1520.  At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset

16

date. (R. 15.) At step two, the ALJ determined that Plaintiff's osteoarthritis constituted a severe impairment, but he concluded that Plaintiff's bilateral knee and right shoulder pain, sleep apnea, and high blood pressure were not severe, finding them "remote, managed medically or otherwise controlled." (R. 15-16.) With respect to Plaintiff's allegations of sleep apnea, the ALJ noted that Plaintiff was prescribed a CPAP machine, reported "feel[ing] well" after follow-up examinations, and that there was no evidence that Plaintiff sought treatment for the condition after November 2015, when his course of treatment before Dr. Ipe concluded. (R. 16.) With respect to his claims of right shoulder pain, the ALJ relied on Plaintiff's post-operative examinations, wherein he reported he was "doing very well," "happy with the results" from surgery, and no longer experienced "terrible pain," as well as Dr. Kelly's conclusion that, based on Plaintiff's post-operative reports, she did not think that Plaintiff needed to go to physical therapy. (R. 16.) The ALJ further explained that the record does not support a finding that Plaintiff's hypertension was "uncontrolled or causes more than a minimal limitation in the claimant's ability to perform basic work activities." (R. 16.) Moreover, although the evidence showed that Plaintiff was obese, the ALJ concluded that Plaintiff "does not treat specifically for his obesity and does not allege any significant limitations resulting from his obesity." (R. 16.)

17

Considering the entire record, and not just Plaintiff's severe impairments, the ALJ then determined that Plaintiff had the residual functional capacity ("RFC") "to perform a medium range of work," albeit with the following non-exertional limitations:

> [C]laimant is limited to lifting 50 pounds occasionally and 25 pounds frequently, sitting for six hours in an eight-hour day and standing and/or walking for six hours in an eight-hour day.  In addition, claimant can frequently crawl, crouch, kneel and stoop and only occasionally be exposed to dust, odors and other pulmonary irritants.

The ALJ first concluded that although Plaintiff's medical impairments could reasonably be expected to produce his symptoms, Plaintiff's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence." (R. 17.)   Summarizing Plaintiff's testimony regarding his pain symptoms, the ALJ observed that Plaintiff claims he is limited to short walks and standing for fifteen minutes, at which time he gets sore joints and muscles and must stretch to get comfortable. (R. 17.)  Plaintiff further testified that in an eight-hour workday he can sit for two hours and stand for two hours until his joints swell up and he experiences pain, which he addresses by stretching out and icing his joints.   (R. 17.)   Summarizing Plaintiff's testimony regarding his daily activities, the ALJ observed that Plaintiff takes his kids out in the morning, prepares their

breakfast, drives them to school almost every day, does "a little light shopping where he can lift a couple of bags," can perform light laundry, housework, and assists his wife with dinner. (R. 17.)

The ALJ next explained his conclusion that the medical evidence did not substantiate Plaintiff's statements about the intensity, persistence, or functionally limiting effects of his pain.  He started by summarizing the medical record, beginning with the October 9, 2013 MRI Plaintiff received on his right knee, which revealed post ACL reconstruction and a mild degree of arthrofibrosis; diminished size of medial meniscus with a superficial horizontal tear of the posterior horn without interval change; and chronic changes of posterior cruciate ligament and posterior lateral capsule, but no torn ligaments.  (R. 18.)  The ALJ then turned to Plaintiff's treatment history with Dr. A. Kelly in the late 2014 through early 2015 time period.  The ALJ noted that Plaintiff reported treating his knee pain with ice and Advil. (R. 18.)  Dr. A. Kelly also reviewed an X-ray of Plaintiff's right knee, which revealed lateral joint significant narrowing and moderate to severe lateral degenerative joint disease.  (R. 18.) While Dr. A. Kelly initially advised Plaintiff that he might be a candidate for arthroscopy if his symptoms continued, at subsequent examinations, Dr. A. Kelly noted that Plaintiff's knee had improved and that a November 24, 2014 injection provided him with relief,

prompting her to recommend Plaintiff obtain an exercise bike and elliptical machine. (R. 18.)

The ALJ next referenced Plaintiff's treatment history before Dr. Milchteim, where he received Orthovisc injections throughout 2016 in his bilateral knees after initial examinations revealed tenderness and limited range of motion without gait abnormality. (R. 18.) Significantly, the ALJ noted that the injections relieved approximately 40% of his pain, and a subsequent X-ray of his left knee showed that his joint spaces were noted to be well maintained with no signs of degenerative disc disease. Plaintiff continued to walk with a normal gait at his consultative examination with Dr. Basnayake on June 29, 2016, where he complained of dull bilateral knee pain that worsened with activities but improved with rest. (R. 18.) The ALJ further discussed Dr. Basnayake's examination, which revealed Plaintiff had full range of motion in his bilateral shoulders, hips, knees, and ankles, as well as stable and non-tender joints. (R. 18.) The ALJ also noted Plaintiff's report regarding his daily living activities, which were consistent with his testimony before the ALJ. (R. 18.)

The ALJ further observed that while Dr. Vekaria recommended in December 2016 that Plaintiff may be a candidate for total knee arthroplasty, Plaintiff reported that physical therapy provided relief and that he would rather continue physical therapy.

(R. 18.)   To that end, the ALJ observed that progress notes from
physical therapy in 2018 indicated that Plaintiff tolerated all
treatment well, with Plaintiff experiencing decreased muscle
tightness, improvement in pain symptoms of his right knee, and
increased muscle length in his bilateral lower extremities.
(R. 18-19.)

In sum, the ALJ found that Plaintiff's complaints of
significant knee pain were undermined by his conservative treatment
plan, including the fact that Plaintiff "reported at multiple
examinations that he does not take any medication for pain," even
though his treatment notes reflect that Plaintiff has good relief
with over-the-counter medications.  (R. 20.)   In support of this
finding, the ALJ referred to Plaintiff's March 21, 2017 visit to
Dr. Varriale and his treatment notes before Dr. Milchteim.
(R. 19.)   Further, the ALJ reasoned that Plaintiff experienced
pain relief with physical therapy and injections.   (R. 19.)
Moreover, the ALJ found that Plaintiff "retains the ability to
perform a significant amount of activities of daily living,"
including waking his kids in the morning, preparing their
breakfast, and driving them to school; light shopping; and light
laundry and other housework.  (R. 19.)   The ALJ also pointed out
that Plaintiff worked as a substitute snowplow operator on two
occasions, which required him to operate the truck for at least

three hours, and that in September 2014, he reported injuries to his left bicep after lifting his motorcycle.  (R. 19.)

Turning to the opinion evidence, the ALJ gave "little weight" to the opinions of the FDNY Medical Board, which recommended full disability for Plaintiff due to his right knee, and of Dr. A. Kelly to the extent she opined Plaintiff was not a candidate to return to his duties as a firefighter, finding the conclusions are "conclusory," do not provide a function-by-function assessment, and lack functional limitations.  (R. 19.) In any event, the opinions arrogate authority reserved to the Commissioner to determine disability.  (R. 19.)

With respect to Dr. Basnayake's opinion that Plaintiff should avoid driving and operating machinery due to his history of sleep apnea, and that Plaintiff has very mild limitations for prolonged standing, walking, climbing, bending, lifting, carrying and kneeling due to his bilateral knee and right shoulder pain, the ALJ determined it was entitled to "some weight," observing the lack of recent treatment for Plaintiff's sleep apnea diagnosis and Plaintiff's statements that he drives.  (R. 20.)  The ALJ also gave "some weight" to the opinion of Dr. Golub, who testified at Plaintiff's hearing.  (R. 20.)  The ALJ explained that while Dr. Golub opined that Plaintiff does not have a severe impairment, he did not have a complete set of records before him when rendering that opinion.  (R. 20.)  Nevertheless, the complete record does

support Plaintiff's claim that his osteoarthritis is a severe condition, the ALJ found.  (R. 20.)

However, the ALJ determined that the opinions of Dr. Varriale and Dr. Steinvurzel were entitled to only "little weight."  (R. 20.)  To begin, the ALJ found Plaintiff's testimony regarding his daily life activities undermined Dr. Varriale's opinion that Plaintiff has a moderate disability that limited him to lifting more than ten pounds and standing or walking for more than 30 minutes at a time.  (R. 20.)  Further, the ALJ determined that the "medical record does not support the extensive limitations that Dr. Steinvurzel opined," including that Plaintiff is limited to less than two hours of sitting, standing, or walking in an eight-hour workday; can only lift less than ten pounds for one-third and less than five pounds for two-thirds of an eight-hour workday; and has difficulty with gripping and grasping.  (R. 20.)  All of Dr. Steinvurzel's findings were made by way of check boxes.  (R. 20.)  Again, the ALJ reasoned that Plaintiff's "activities of daily living support that [he] is less limited" than Dr. Steinvurzel opined.  (R. 20.)  The ALJ also pointed out that Plaintiff testified he was able to operate a truck with a snowplow for at least three hours on two occasions and could do so in the future.  (R. 20.)

Proceeding to step four, the ALJ found that Plaintiff could not perform past relevant work as a firefighter.  (R 21.)

23

However, the ALJ concluded that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, consistent with his RFC, such as hand packager, kitchen helper, and cook helper.  (R. 21-22.)  Accordingly, the ALJ determined that Plaintiff is not disabled.  (R 22.)

III. Analysis

     Plaintiff advances the following arguments: (1) the ALJ erred in finding that the Plaintiff's bilateral knee pain, right shoulder pain, sleep apnea, hypertension, and obesity were not severe impairments under step two; (2) the ALJ failed to follow the treating physician rule; and (3) the ALJ erred in his credibility assessment of Plaintiff.

     A.   Plaintiff's Severe Impairments

     Plaintiff argues that the medical records before the ALJ contain significantly more than the de minimis level of evidence required to establish his bilateral knee pain, right shoulder pain, sleep apnea, hypertension, and obesity impairments are severe. Contrary to the ALJ's conclusion that these impairments were "remote, managed medically or otherwise controlled," Plaintiff contends these impairments are well documented in the record and have caused years of ongoing problems requiring treatment, medications, and functional limitations.  (Pl. Support Memo at 11.)  The Commissioner responds that substantial evidence supports

the ALJ's findings at step two, and, in any event, the ALJ accounted for Plaintiff's non-severe impairments in the RFC.

"[T]he standard for a finding of severity under Step Two of the sequential analysis is de minimis and is intended only to screen out the very weakest cases." McIntyre v. Colvin, 758 F.3d 146, 151 (2d Cir. 2014) (citing Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995)).  "The 'mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment' is not, itself, sufficient to deem a condition severe." Tryon v. Astrue, No. 10-CV-0537, 2012 WL 398952, at *3 (N.D.N.Y. Feb. 7, 2012) (quoting McConnell v. Astrue, No. 03-CV-0521, 2008 WL 833968, at *2 (N.D.N.Y. 2008)). Rather, an impairment is severe where it "significantly limits the plaintiff's physical and/or mental ability to do basic work activities." Truman v. Comm'r of Soc. Sec., No. 14-CV-1195, 2015 WL 5512225, at *4 (N.D.N.Y. Sept. 17, 2015) (citing 20 C.F.R. § 404.1520(c); 20 C.F.R. § 404.1521). The plaintiff has the burden at step two in the sequential evaluation process to demonstrate the severity of his impairment. Tryon, 2012 WL 398952, at *3 (citing 20 C.F.R. § 404.1520(c)).

To begin, the Court agrees with the Commissioner that the ALJ's determination at step two is supported by substantial evidence, and Plaintiff has not met his burden to show otherwise. With respect to his hypertension and obesity, Plaintiff points to

no medical evidence that these impairments significantly limit his ability to do basic work activities or that Plaintiff's doctors ascribed any functional limitations to them.  Rather, he argues his obesity was "consistently noted throughout the record."  (Pl. Support Memo at 12.)  But the mere fact Plaintiff has been diagnosed with hypertension and obesity does not, on its own, make these impairments severe.  Tryon, 2012 WL 398952, at *3; see also Martin v. Astrue, 337 F. App'x 87, 89 (2d Cir. 2009) (upholding ALJ's determination that the plaintiff's obesity was not a severe impairment, even where the medical reports diagnosed the plaintiff with obesity, because those records "provide[d] no evidence of severe impairment limiting work ability").

The foregoing analysis applies with equal force to Plaintiff's sleep apnea:  There is no objective evidence to show that Plaintiff's sleep apnea affected his ability to perform work-related activities.  See Truman, 2015 WL 5512225, at *8.  Moreover, as the ALJ found, Plaintiff did not seek treatment for his sleep apnea after November 2015.  Anderson v. Colvin, No. 12-CV-0200, 2014 WL 4269056, at *6 (W.D.N.Y. Aug. 28, 2014) (finding lack of treatment history relevant in determining whether an impairment is severe).[5]  And contrary to Plaintiff's argument, Dr. Ipe did not

---

[5] The Court recognizes that "a lack of treatment 'does not, without more, establish that the impairment was non-severe,'" especially where other causes may explain the failure to seek treatment, Canestrare v. Comm'r of Soc. Sec., No. 16-CV-0920, 2017 WL 3130327,

explicitly find Plaintiff's sleep apnea caused his fatigue.  At most, the medical record on this point is mixed, with Dr. Ipe identifying "other etiology" for Plaintiff's fatigue, such as low testosterone and vitamin D levels, or alcohol withdrawal.  "Because there is substantial evidence in the record to support the ALJ's determination with regard to [Plaintiff's] purported sleep apnea, it will not be disturbed."  Wavercak v. Astrue, 420 F. App'x 91, 93 (2d Cir. 2011).

Last, the ALJ's determination that Plaintiff's right shoulder pain is not a severe impairment is supported by substantial evidence, including Plaintiff's treatment history before Dr. A. Kelly.  As the ALJ correctly pointed out, after his right shoulder surgery before Dr. A. Kelly, Plaintiff consistently reported that he was "doing very well" and was "happy with the results," which led Dr. A. Kelly to find physical therapy unnecessary.  "A condition is not severe if the impairment improves from treatment."  Jackson v. Comm'r of Soc. Sec., No. 19-CV-0378, 2020 WL 3063955, at *3 (W.D.N.Y. June 9, 2020) (citing Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983)); see also Woodmancy v. Colvin, 577 F. App'x 72, 74 (2d Cir. 2014) (holding the plaintiff did not meet his burden to show that various impairments,

_____

at *6 (N.D.N.Y. July 21, 2017) (quoting Hamilton v. Colvin, 8 F. Supp. 3d 232, 240 (N.D.N.Y. 2013), but notes the ALJ's conclusion did not turn on this fact alone.

including sleep apnea, were severe when the plaintiff benefitted from treatment in ways that minimized their impairing effect).  In any event, the ALJ proceeded with the sequential analysis.  In the remaining steps, the ALJ discussed all of Plaintiff's medical treatment and considered Plaintiff's right shoulder impairments in determining his RFC.  Indeed, the ALJ concluded Plaintiff was limited to lifting fifty pounds occasionally and twenty-five pounds frequently, limitations addressed to his right shoulder impairment.[6]  "Often, when there are multiple impairments, and the ALJ finds some, but not all of them severe, an error in the severity analysis at step two may be harmless because the ALJ continued with the sequential analysis and did not deny the claim based on the lack of a severe impairment alone."  Truman, 2015 WL 5512225, at *5 (citing Tryon, 2012 WL 398952, at *3).  "As the ALJ proceeded with the analysis and included plaintiff's severe and non-severe impairments in the RFC determination, there is no basis to remand this matter based upon the ALJ's step two analysis."  Tryon, 2012 WL 398952, at *4; see also Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. May 2, 2013) (where the ALJ proceeds past step two and considers the effects of all of the plaintiff's impairments through the remainder of the sequential evaluation process, any error at step two is harmless); Stanton v. Astrue, 370 F. App'x

---

[6] The ALJ also considered the effects of Plaintiff's sleep apnea in crafting the RFC.  (R. 20.)

231, 233 n.1 (2d Cir. Mar. 24, 2010) (errors at step two are harmless so long as the ALJ continues with the sequential analysis); Ann C. v. Comm'r of Soc. Sec., No. 19-CV-0904, 2020 WL 4284132, at *5 (N.D.N.Y. July 24, 2020) ("Even if the ALJ had erred at step two of the sequential analysis, the Second Circuit has repeatedly found such errors to be harmless where the ALJ continues with the remaining steps of the sequential evaluation."), aff'd sub nom. Cuda v. Comm'r of Soc. Sec., No. 20-CV-2819, 2021 WL 4887993 (2d Cir. Oct. 20, 2021).

B.   Treating Physician Rule

Next, Plaintiff argues that the ALJ erred in giving "little weight" to the opinion of Dr. Steinvurzel, Plaintiff's treating physician. (Pl. Support Memo at 13-20.) According to Plaintiff, the ALJ "relied on an exaggeration of Plaintiff's activities of daily living and the fact that Dr. Steinvurzel's assessment included 'check boxes.'" (Id. at 15.) Further, Plaintiff argues the ALJ erred in crediting the opinion of Dr. Golub, the testifying expert, giving it "some weight" notwithstanding the fact that Dr. Golub had not reviewed all the medical records relevant to Plaintiff's condition. (Id. at 17.) Plaintiff also points out that the ALJ did not apply the factors typically used to determine how much weight to give the treating physician. (Id. at 18.) Plaintiff argues that the ALJ cherry-picked medical evidence that supported a finding of not disabled;

for example, the ALJ gave little weight to Dr. Varriale's opinion, which was consistent with the opinion rendered by Dr. Steinvurzel, but instead gave the most weight to the Dr. Golub.  (Id. at 19.) According to Plaintiff, had the ALJ heeded Dr. Steinvurzel's opinion, he would have concluded that Plaintiff's RFC limited him to less than sedentary work, not medium work at the ALJ found. The Commissioner counters that Dr. Steinvurzel's opinion was not entitled to controlling weight given his brief treatment history with Plaintiff.  (Comm'r Support Memo at 18.)  Regardless, the Commissioner argues the ALJ appropriately gave Dr. Steinvurzel's opinion little weight after considering the medical record as a whole, which the ALJ found undermined Dr. Steinvurzel's prescribed limitations.  (Id. at 19-22.)  The Court agrees with the Commissioner.

The Court applies the treating physician rule because Plaintiff filed his claim before March 27, 2017.  See 20 C.F.R. § 404.1527.  The "treating physician rule" provides that the medical opinions and reports of a claimant's treating physicians are to be given "special evidentiary weight."  Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir. 1998).  The regulations state:

> Generally, we give more weight to medical
> opinions from your treating sources . . . .
> If we find that a treating source's medical
> opinion on the issue(s) of the nature and
> severity of your impairment(s) is well-

> supported by medically acceptable clinical and
> laboratory diagnostic techniques and is not
> inconsistent with the other substantial
> evidence in your case record, we will give it
> controlling weight.

20 C.F.R. § 404.1527(c)(2). Thus, the opinion of a treating physician "need not be given controlling weight where [it is] contradicted by other substantial evidence in the record." Molina v. Colvin, No. 13-CV-4701, 2014 WL 3925303, at *2 (S.D.N.Y. Aug. 7, 2014) (internal quotation marks and citation omitted). When an ALJ does not afford controlling weight to the opinion of a treating physician, the ALJ must consider several factors: "(1) the length of the treatment relationship and frequency of the examination; (2) the nature and extent of the treatment relationship; (3) the extent to which the opinion is supported by medical and laboratory findings; (4) the physician's consistency with the record as a whole; and (5) whether the physician is a specialist." Schnetzler v. Astrue, 533 F. Supp. 2d 272, 286 (E.D.N.Y. 2008). The ALJ must also set forth "'good reasons' for not crediting the opinion of a [plaintiff's] treating physician." Id. at 287. An ALJ provides "'good reasons' for discounting a treating physician's opinion that reflect in substance the factors as set forth in [Section] 404.1527(d)(2), even though the ALJ declines to examine the factors with explicit reference to the regulation." Crowell v. Comm'r of Soc. Sec., 705 F. App'x 34, 35 (2d Cir. 2017) ("While the ALJ did not explicitly discuss the treating physician rule, he nonetheless

stated that [the physician's] opinion . . . was contradictory to the rest of the record evidence."). "Ultimately, an ALJ must comprehensively set forth her reasons for the weight assigned to a treating physician's opinion." Id. (internal quotation marks and citation omitted).

As an initial matter, the Court is hard pressed to find Dr. Steinvurzel was Plaintiff's treating physician, such that his opinion should be entitled to controlling weight. The medical record in this case extends back to 2013, if not earlier. Yet Plaintiff did not establish care with Dr. Steinvurzel until March 2018. And upon establishing care, Plaintiff visited Dr. Steinvurzel on just three occasions throughout 2018. "[T]hree examinations by [a physician] over the course of four months in 2008 does not constitute the type of 'ongoing relationship' that is required for finding that s/he is plaintiff's treating physician under the relevant regulations." Patterson v. Astrue, No. 11-CV-1143, 2013 WL 638617, at *8 (N.D.N.Y. Jan. 24, 2013) (citations omitted), report and recommendation adopted, 2013 WL 592123 (N.D.N.Y. Feb. 14, 2013); see also Jasen v. Comm'r of Soc. Sec., No. 16-CV-6153, 2017 WL 3722454, at *10 (W.D.N.Y. Aug. 29, 2017) ("The lack of an established, ongoing relationship undercuts [the claimant's] contention that [the physician] should be considered a treating physician." (citing cases)).

In any event, an ALJ may decline to give controlling weight to the treating physician's opinion "if he is able to set forth good reason for doing so," and "the less consistent an opinion is with the record as a whole, the less weight it is to be given." Tryon, 2012 WL 398952, at *5 (first citing Saxon v. Astrue, 781 F. Supp. 2d 92, 102 (N.D.N.Y. 2011); and then citing Otts v. Comm'r of Soc. Sec., 249 F. App'x 887, 889 (2d Cir. 2007)); see also Halloran v. Barnhart, 362 F.3d 28, 32 (2d Cir. 2004). Such is the case here.  The ALJ explicitly found that the "medical record does not support the extensive limitations that Dr. Steinvurzel opined," and then proceeded to discuss that evidence. (R. 20.)  First, the ALJ noted that Dr. Steinvurzel delineated Plaintiff's limitations in checkbox form, a "not particularly informative" means of prescribing limitations. Halloran, 362 F.3d at 32 (concluding the ALJ appropriately declined to give a physician's checkbox opinion controlling weight).  Next, the ALJ examined Plaintiff's longitudinal treatment history before Dr. A. Kelly and Dr. Milchteim, both orthopedists.  These providers treated Plaintiff for knee pain[7] at dozens of visits over several years, with each reporting pain relief with treatment, including over-the-counter medications and injections.  There is little, if any, support in Dr. A. Kelly's or Dr. Milchteim's treatment history

---

[7] Dr. A. Kelly also treated Plaintiff's right shoulder pain.

for the extensive limitations Dr. Steinvurzel prescribed.  Last, the ALJ reasoned that Plaintiff's daily activities, as reported by Plaintiff at his hearing and to Dr. Basnayake, showed he was not as limited as Dr. Steinvurzel indicated.  As the foregoing makes clear, the ALJ set forth good reasons for discounting Dr. Steinvurzel's opinion, which was inconsistent with the medical record as a whole.

Plaintiff's remaining arguments are unavailing.  To the extent Plaintiff faults the ALJ for not explicitly analyzing each factor provided in 20 C.F.R. § 404.1527(c), it is well established that "no such slavish recitation of each and every factor" is required "where the ALJ's reasoning and adherence to the regulation are clear," as they are here.  Atwater v. Astrue, 512 F. App'x 67, 70 (2d Cir. 2013); see also Crowell, 705 F. App'x at 35.  Nor does the Court find issue with the ALJ's determination to give little weight to the opinion of Dr. Varriale's, who saw Plaintiff once and whose prescribed limitations were undermined by Plaintiff's testimony and reports of daily activities to Dr. Basnayake.  Finally, Plaintiff faults the ALJ for giving some weight to the opinion of Dr. Golub, who testified that he had not reviewed all the medical records relevant to Plaintiff's condition.  At first glance this is concerning.  However, on closer examination the Court notes that the limited subset of records Dr. Golub reviewed runs eighty pages and includes Plaintiff's treatment history

before Dr. A. Kelly, Dr. Ipe, and Dr. Milchteim.   In any event, the ALJ acknowledged the shortcomings in Dr. Golub's opinion and explicitly relied on the complete medical record in concluding certain of Plaintiff's impairments are not severe.   Plaintiff's contention that "the ALJ relied most" on Mr. Golub's testimony in arriving at the RFC is not an accurate characterization of the ALJ's analysis.

>    C.   The ALJ's Credibility Assessment

Last, Plaintiff argues that the ALJ failed to properly assess Plaintiff's subjective complaints of pain, instead mischaracterizing his daily activities and failing to discuss factors relevant to discrediting Plaintiff's credibility.   (Pl. Support Memo at 22-24.)   The Court disagrees.

"When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account . . . but is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (first citing 20 C.F.R. § 416.929; and McLaughlin v. Sec'y of Health, Educ. & Welfare, 612 F.2d 701, 704-05 (2d Cir. 1980); and then citing Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979)).   Social Security regulations outline a two-step process for evaluating symptoms such as pain.   See 20

C.F.R. § 416.929.  First, the ALJ must determine whether Plaintiff suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  <u>Genier</u>, 606 F.3d at 49 (citing 20 C.F.R. § 416.929(b)).  To do so, the ALJ is required to consider Plaintiff's allegations alongside the available medical evidence.  <u>See</u> <u>Cichocki v. Astrue</u>, 534 F. App'x 71, 75-76 (2d Cir. 2013).

But while "[o]bjective medical evidence is useful," the ALJ "will not reject statements about the intensity and persistence of pain and other symptoms 'solely because the available objective medical evidence does not substantiate [Plaintiff's] statements.'" <u>Id.</u> at 76 (quoting 20 C.F.R. § 416.929(c)(2)).  Rather, at step two, if Plaintiff's testimony regarding his symptoms is not substantiated by the objective medical evidence, the ALJ must consider "other evidence" in the record, such as:

(i)      Plaintiff's daily activities;

(ii)     The location, duration, frequency, and intensity of Plaintiff's pain or other symptoms;

(iii)    Precipitating and aggravating factors;

(iv)     The type, dosage, effectiveness, and side effects of any medication Plaintiff takes or has taken to alleviate his pain or other symptoms;

(v)      Treatment, other than medication, Plaintiff receives or has received for relief of his pain or other symptoms;

(vi)     Any measures Plaintiff uses or has used to relieve pain or other symptoms; and

(vii)    Other factors concerning Plaintiff's functional limitations and restrictions due to pain or other symptoms.

Id. (quoting 20 C.F.R. § 416.929(c)(3)).  The ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight."  SSR 96-7p, 1996 WL 374186, at *2.  Nevertheless, "remand is not required where 'the evidence of record permits us to glean the rationale of an ALJ's decision.'" Cichocki, 534 F. App'x at 76 (quoting Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983)).

       The Court must defer to the ALJ's credibility findings, which are supported by substantial evidence.  Calabrese v. Astrue, 358 F. App'x 274, 277 (2d Cir. 2009).  The ALJ did not "mischaracterize the Plaintiff's daily activities," as Plaintiff claims; rather, the ALJ adopted the daily activities Plaintiff testified to at the hearing and reported to Mr. Basnayake, finding they did not indicate that Plaintiff's functioning was as limited as he alleged.  After all, "[i]t is the function of the [Commissioner], not the [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant."  Id. (quoting Aponte v. Sec'y, Dep't of Health & Human Servs., 728 F.2d 588, 591 (2d Cir. 1984)).  Because the ALJ thoroughly explained his credibility determination and the record evidence, the Court will not substitute its own opinion for that

37

of the ALJ.  <u>Cichocki</u>, 534 F. App'x at 76; <u>see also</u> <u>Valente v.</u>
<u>Sec'y of Health & Hum. Servs.</u>, 733 F.2d 1037, 1041 (2d Cir. 1984)
("The court may not substitute its own judgment for that of the
Secretary, even if it might justifiably have reached a different
result upon a de novo review.").

CONCLUSION

For the foregoing reasons, Plaintiff's motion
(ECF No. 9) is DENIED as stated herein, and the Commissioner's
cross-motion (ECF No. 11) is GRANTED.  The Clerk of the Court is
directed to enter judgment accordingly and mark this case CLOSED.

**SO ORDERED.**

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:    August  10 , 2022
          Central Islip, New York